**UNITED STATES DISTRICT COURT**

**DISTRICT OF MINNESOTA**

---

EDWARDS BURNS,

Plaintiff,

v.

HY-VEE, INC.,

Defendant.

Civil No. 02-254 (JRT/FLN)

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

Steven L. Smith, SMITH LAW OFFICE, 10 South Fifth Street, Suite 700, Minneapolis, MN 55402, for plaintiff.

Jeffrey J. Lundquist, PUSTORINO, TILTON, PARRINGTON & LINDQUIST, 4005 West 65th Street, Suite 200, Minneapolis, MN 55435, for defendant.

Plaintiff Edwards Burns ("Burns") has sued his former employer, Hy-Vee, Inc. ("Hy-Vee"), alleging that: (1) he was unlawfully terminated because of his race, in violation of 42 U.S.C. § 1981; (2) Hy-Vee unlawfully retaliated against him for filing a discrimination complaint, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, and the Minnesota Human Rights Act ("MHRA"), Minn. Stat. §§ 363 *et seq.*; and (3) Hy-Vee tortiously interfered with Burns's employment contract with Nabisco. Hy-Vee has moved for summary judgment on all counts of Burns's

FILED MAY 2 3 2003
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD. MAY 2 3 2003
DEPUTY CLERK

complaint. For the reasons discussed below, the Court now grants Hy-Vee's motion for summary judgment.

## BACKGROUND

### I. Burns's Initial Work History at Hy-Vee

Hy-Vee operates supermarkets and retail stores in several Midwestern states. Burns began working for Hy-Vee as an assistant shift manager in its Sioux Falls, South Dakota grocery store in June 1994. Both parties agree that Hy-Vee was especially interested in hiring Burns, an African-American, because the company sought to increase diversity in its managerial ranks. A few months after being hired, Burns was promoted to shift manager. He received good performance reviews and apparently had a good relationship with his supervisors at the store and at corporate levels, including Randy Edeker ("Edeker"), director of operations for Hy-Vee's Cherokee Division, and Ray Stewart ("Stewart"), executive vice president of the Cherokee division.

Both of these Hy-Vee officials apparently took an interest in Burns's advancement. In particular, Burns testified that Stewart frequently said that he would be the next store manager when a position came open. In June 1997, with the apparent support of Edeker and Stewart, Burns was transferred to a new Hy-Vee store in Mankato, Minnesota, and was promoted to assistant food store manager. Burns sought this transfer so he could be closer to his son.

Once he began working at the Mankato store, Burns apparently began having trouble at work, and supervisors recorded him as having problems with absences, honesty

with supervisors, and, in particular, keeping personal matters out of the workplace. At one point, Burns complained to his store manager about unfair scheduling and "harassment" by some of the other assistant managers. Burns did not suggest to his manager that the harassment was due to race. The issue was brought to Edeker's attention, and the problem was solved. Burns claims that the assistant store manager, Diana Smith, wanted to "get rid of him."

## II. Burns's Termination

On Sunday, March 28, 1999, Burns was working at Hy-Vee as the assistant manager when he made at least two phone calls from the store to a former girlfriend. Burns knew that in making these calls, he was violating an Order for Protection that his girlfriend had obtained. Burns testified that he then felt guilty about violating the order, so he called the police to report his violation. Soon after, a police officer arrived, asking Burns to step outside the store and speak with him for a few minutes. Burns testified that he did not expect to leave work at that time. After a few minutes, however, the officer received orders to take Burns into custody. Burns did not tell his supervisor or anyone else at the store that he was speaking to a police officer, nor that he was leaving. The officer would not let Burns out of the squad car to re-enter the store, but Burns testified that the officer said he would go inside and inform Hy-Vee that he "needed to take me down [to the police station] for a few minutes and I would be right back." (Burns Dep. at 130.) Hy-Vee contends that neither the ranking manager on duty at the time, nor the

overall store manager knew where Burns had gone. The officer arrested Burns and transported him to the police station.

Upon reaching the police station, Burns was told that he would be kept overnight. Burns thus missed the remainder of his work shift for that day. He did not attempt to contact Hy-Vee to explain his situation. Burns was also in custody the entire next day, Monday, March 29, and missed another work shift. He made no attempt to contact Hy-Vee about this absence, either. Following a court appearance, Burns was released from custody on Tuesday morning, March 30. Burns was scheduled to work that day, but he did not. Instead, he went to Hy-Vee and, in the absence of store manager Dan Wampler ("Wampler"), Burns informed an assistant manager that he "needed to take a leave of absence." (*Id.* at 137.) When Burns was told that Wampler would not be available until the next day, Burns said that he would call Wampler then. Burns did not tell the assistant manager why he needed a leave of absence, or where he had been for the previous two days. Burns later testified that he needed the leave of absence because a knee injury had "flared up so badly [he] couldn't walk." (*Id.* at 137-38.)

The next morning, Wednesday, March 31, 1999, Burns telephoned Wampler and said he would try to return to work the following day. Burns testified that he did not tell Wampler why he had been absent the previous days. Wampler testified, however, that Burns told him in this phone call that Burns had been arrested.[1] This appears to be the

[1] In his deposition, Wampler initially testified that Burns telephoned him on Tuesday, March 31. He later corrected himself, recognizing that March 31 was in fact a Wednesday. (*See* Wampler Dep. at 55.)

first time that anyone at Hy-Vee knew Burns had been arrested and incarcerated.[2] Wampler documented this conversation with a handwritten memo dated March 31, 1999. The memo stated:

> Edwards called me at 7:00 a.m. He stated that he was going to take some time off because he wouldn't be good at work at the present time. . . . I said that when he call [sic] the police and turned himself in on Sunday (3/28) the [sic] he never told anyone at the store that he was leaving or anything. He . . . didn't tell anyone where he was at. He stated that he would come back to work on Thursday then I told him that he already missed Monday & Tuesday. I told him that I would have to talk to Randy [Edeker] about him and get back to him on what we were going to do.
>
> Dan
>
> Note: When Edwards went to jail on Sunday we never heard anything from him until he came to the store on Tuesday afternoon and cleared his desk off and stated to [the assistant manager] that he was going to take a leave from work.

(Smith Aff. Ex. A, Bates # 000178.)

Wampler told Burns that he would need to consult the corporate office to see about Burns's employment status. Wampler testified that he then telephoned Edeker and told him that Burns "had broke the law while working at work." (Wampler Dep. at 41.) Following this call from Wampler, Edeker contacted Ray Stewart, the division's executive vice president. Edeker told Stewart "what had happened, that [Burns] had been incarcerated at the store and removed. And that the following days he did not show up for work . . . ." (Edeker Dep. at 78.) Edeker and Stewart "both felt" that they had given

[2] Wampler testified that on Tuesday afternoon when Burns came into the store and announced that he was taking leave, the company "did not know anything" about why Burns had been absent. (*See* Wampler Dep. at 56-57.)

Burns "all of the chances that we could and that it was time to terminate him." (*Id.*) Stewart asked Edeker to go to Mankato to fire Burns because Wampler had only recently been hired as store manager. (*Id.*)

On April 1, 1999, Wampler telephoned Burns and told him to be at the store the following day, Friday, April 2, to meet with Randy Edeker. At that meeting, Burns was terminated "for unacceptable performance." (Smith Aff. Ex. A, Bates # 00129.)

## III. Burns's Discrimination Complaint and Nabisco Job Offer

On March 29, 2000, Burns filed a charge of discrimination with the Minnesota Department of Human Rights (the "MDHR charge"), alleging that Hy-Vee terminated him because of his race. This charge was later dismissed with a finding of no probable cause. On August 7, 2000, Burns received a job offer from the Nabisco company to work as a customer sales representative. This offer was expressly contingent upon successful completion of a background check and other procedures. The position would have required Burns to sell Nabisco products and manage merchandise in several Hy-Vee stores. Stewart of Hy-Vee learned of this offer, and determined that it was not "in the best interest for Edwards or Hy-Vee for him to service our stores."[3] (Stewart Dep. at 23.) On September 11, 2000, Nabisco rescinded its job offer, stating that Burns could not meet the position's job requirements. Nabisco stated that the "position requires sales and

[3] Burns claims that Stewart barred him from even entering any Hy-Vee stores, but provides no evidence for this assertion.

service work to be done in Hy-Vee stores. Per the customer's direction, we are not allowed to have you service those stores." (Smith Aff. Ex. A, Bates # 00248.)

## ANALYSIS

### I. Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56. Only disputes over facts that might affect the outcome of the suit under the governing substantive law will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is not appropriate if the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* Summary judgment is to be granted only where the evidence is such that no reasonable jury could return a verdict for the nonmoving party. *Id.*

The moving party bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The nonmoving party is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts in the record. *Vette Co. v. Aetna Casualty & Surety Co.*, 612 F.2d 1076, 1077 (8th Cir. 1980). However, the nonmoving party may not merely rest upon

allegations or denials in its pleadings, but it must set forth specific facts by affidavits or otherwise showing that there is a genuine issue for trial. *Forrest v. Kraft Foods, Inc.*, 285 F.3d 688, 691 (8th Cir. 2002).

## II. Discriminatory Discharge

Count I of Burns's complaint alleges that Hy-Vee discharged him because of his race in violation of 42 U.S.C. § 1981. This discriminatory discharge claim is analyzed under the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Burns must first demonstrate a prima facie case of discrimination. If he does so, the burden of production shifts to Hy-Vee to produce sufficient evidence that would allow a reasonable trier of fact to conclude that there was a legitimate, nondiscriminatory reasons for its actions. If Hy-Vee can do this, the burden shifts back to Burns to demonstrate that Hy-Vee's reason is a pretext for discrimination.

To make a prima facie case of discrimination, Burns must show that: (1) he was a member of a protected group; (2) he performed his job at a level that met Hy-Vee's legitimate expectations; (3) he suffered an adverse employment action; and (3) the facts permit an inference of discrimination. *Taylor v. Southwestern Bell Telephone Co.*, 251 F.3d 735, 740 (8th Cir. 2001).

Hy-Vee claims that Burns has not made out a prima facie case of discrimination because he has not shown any facts that would support an inference of discrimination. Indeed, Burns has provided little evidence of discrimination. In fact, the evidence seems to indicate that Hy-Vee management wanted Burns to succeed. Burns does point out

evidence which he argues supports his discrimination claims. This involves Diana Smith, who, according to Burns, did not like him and was "out to get him." Burns contends that Smith kept a "secret file" of memos and other information on him, and also contends that Smith used racist language on at least one occasion. These facts, however, are insufficient to raise an inference of discrimination.

First, Burns has provided no evidence that the memos he claims constitute a "secret file" were aimed solely at him. Smith has testified that she kept memos on various matters and employees to help her remember important events at the store. Second, Burns has not shown that any racist statements by Smith or others were anything more than "stray remarks." It is well established that such remarks do not support an inference of intentional discrimination. *See Aucutt v. Six Flags Over Mid-America*, 85 F.3d 1311, 1315-16 (8th Cir. 1996). Finally, the record clearly shows that Smith was not in any way involved in the decision-making process to terminate Burns. Even racially derisive statements made by employees not involved in an adverse employment decision cannot give rise to an inference of discrimination. *See Lee v. State of Minnesota, Department of Commerce*, 157 F.3d 1130, 1135 (8th Cir. 1998); *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 512 (8th Cir. 1995). The Court finds that Burns has not presented facts that point to an inference of discrimination, and therefore concludes that he cannot establish a prima facie case of discrimination.

Even if Burns has demonstrated a prima facie case of discrimination, he has not shown that Hy-Vee's legitimate non-discriminatory reason is pretext. Hy-Vee states that its reasons for firing Burns are that: (1) he willfully violated the law during work hours

on company property; (2) he was arrested on company property; (3) when arrested, he abandoned his work shift without notifying the company where he was going; (4) he missed multiple work shifts because of his incarceration; and (5) he made no effort to explain his absence or to alert Hy-Vee why he was absent.

Burns argues that these reasons are pretextual, his principal argument[4] being that the reasons are "fabrications based on information [Hy-Vee] obtained after terminating him." (Pl. Mem. at 13.) Burns contends that, prior to terminating him, Hy-Vee knew only that he had missed work, and that upon later learning the reasons for his absence, used the arrest as a pretext for its decision. The evidence, however, does not support Burns's argument.

Burns alleges that "Hy-Vee had no idea that Burns had violated the Order for Protection, or that he had been arrested as a result," citing portions of Wampler's deposition in support. A close look at this deposition, however, reveals that Burns's statement is inaccurate. As described above, it is clear from Wampler's testimony and his handwritten note dated March 31, 1999 that Wampler knew Burns had been arrested, and that he informed Edeker of this fact **before** the decision was made to terminate him. Edeker's deposition testimony also shows that the decision to terminate was made with the knowledge that Burns "had been arrested at the store and taken out of the store."

[4] Burns also suggests (in a footnote) that another non-black assistant manager was treated more leniently than he for a similar offense. While Hy-Vee spends a great deal of time refuting these allegations in its original memorandum, Burns does not pursue this argument. Moreover, Burns provides no evidence that he and this other employee, Tai Wang, were similarly situated. (*See* Pl. Mem. at 8 n. 3.)

(Edeker Dep. at 77.) Burns attempts to show confusion over the timeline, making it seem as if Hy-Vee made the decision to terminate him without knowing that he had been arrested.[5] Both Wampler's and Edeker's testimony, however, demonstrate the opposite to be true.

Burns also questions the credibility of Stewart's deposition testimony, claiming that there are discrepancies between the facts articulated by Stewart, Wampler, and Edeker. In particular, Burns notes that both Wampler and Edeker indicated that Stewart was involved in the decision to fire Burns. Edeker testified that he and Stewart "had a discussion and we both knew that we needed to terminate," and that Stewart asked him to go to Mankato because Wampler was new in the store. (Edeker Dep. at 77-78.) Likewise, Wampler testified that Stewart called to tell him the decision that Burns would be terminated. (Wampler Dep. at 44.)

Stewart testified that he was not involved in the decision to terminate Burns, that he didn't recall talking to Wampler about it, and that he learned of the termination from Edeker. When asked who made the decision, Stewart said that "[i]t would have to be the store director," Wampler. (Stewart Dep. at 19.) According to Stewart's deposition, he remembered little about this episode, and claimed that he doesn't "get into the day-to-day operations of any store." (*Id.* at 20.) Stewart's testimony does seem to contradict that of

[5] Burns also attempts to make an issue over whether Hy-Vee knew why he had been arrested. It is not clear from the record that Hy-Vee knew why Burns was arrested. Indeed, it may not have known. This fact, however, is immaterial to the legal analysis. Hy-Vee notes that Burns was not fired because he violated the order for protection, but rather because he violated the law while at work and was arrested at work. (*See* Def. Mem. at 15.) As discussed above, the evidence makes clear that Hy-Vee did know these facts before terminating Burns.

Wampler and Edeker on the issue of his involvement, and Burns makes much of this "credibility problem." However, even if Stewart was lying, these contradictions are not relevant to the material issue that Burns tries to raise – when Hy-Vee knew that Burns was arrested. Stewart's testimony in no way contradicts that of Wampler or Edeker, which shows that Hy-Vee knew Burns had been arrested before deciding to terminate him. In fact, Stewart does not even address this issue. Thus, no matter who decided to fire Burns, the evidence is clear that Hy-Vee knew beforehand that he had been arrested.

These allegations – that Hy-Vee fired him without knowing of his arrest and later fabricated its reasons – are Burns's only "evidence" of pretext. As discussed above, this evidence has little probative value and is contradicted by the bulk of the other evidence in the case. The other evidence, especially the testimony of Wampler and Edeker, shows that Hy-Vee's reasons for terminating Burns were valid. *See Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 148-49 (2000) (holding that determination of pretext rests on strength of plaintiff's prima facie case, probative value of proof that employer's explanation is false, and "any other evidence that supports the employer's case"). Therefore, the Court finds that Burns's has not shown Hy-Vee's legitimate non-discriminatory reasons to be pretext. Even if Burns can establish a prima facie case of discrimination, the Court would still grant Hy-Vee's motion for summary judgment on Count I, the discriminatory discharge count.

**III. Retaliation under Title VII and the MHRA**

Count III of Burns's complaint alleges that Hy-Vee unlawfully retaliated against him by preventing him from servicing Hy-Vee stores for Nabisco, thus forcing Nabisco to revoke its job offer. Burns claims that this was in retaliation for his filing a discrimination complaint with the Minnesota Department of Human Rights regarding his termination.

Retaliation claims under Title VII[6] also proceed under the *McDonnell Douglas* framework. *Womack v. Munson*, 619 F.2d 1292, 1296 (8th Cir. 1980). To present a prima facie case of retaliation, Burns must show: (1) that he engaged in statutorily protected conduct; (2) that he suffered an adverse employment action; and (3) a causal connection between the two. *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999). Hy-Vee argues that Burns has not shown a causal connection between the MDHR charge and Hy-Vee's actions that led him to lose the Nabisco offer. Hy-Vee further argues that even if Burns has made a prima facie case of retaliation, he cannot show that its articulated reason for barring him from servicing its stores is pretext.

Burns contends that the closeness in time between the MDHR charge and Hy-Vee's refusal to let him service its stores is sufficient to show a causal connection for purposes of establishing a prima facie case. In support, Burns relies heavily on *O'Bryan v. KTIV Television*, 64 F.3d 1188 (8th Cir. 1995). In that case, the Eighth Circuit held that a plaintiff who was discharged three months after filing a civil rights complaint showed

[6] The Court uses Title VII case law to analyze claims under the MHRA. *Mems v. City of St. Paul, Dept. of Fire and Safety Services*, 224 F.3d 735, 738 (8th Cir. 2000).

his former employer's reason for discharging him to be pretext. *See id.* at 1194-95. *O'Bryan*, however, did not hold that the temporal proximity between the plaintiff's complaint and his termination was sufficient to show pretext. In *O'Bryan*, the plaintiff "was subjected to unprecedented job scrutiny, was required to meet brand new performance guidelines, and was given a probationary ultimatum which led directly to his termination, all within a matter of only a few weeks after his protected conduct occurred." *Id.* at 1194. The evidence in that case also contained two statements made by a supervisor "from which a retaliatory motive could be inferred." *Id.*

In this case, Burns filed his MDHR charge on March 29, 2000. Hy-Vee could not have retaliated any earlier than August 7, 2000, the date on which Nabisco extended its job offer. The only evidence that Burns provides of retaliation is this time frame, a gap of more than four months. None of the other factors present in *O'Bryan* exist here, and thus this "mere coincidence of timing" is not enough to create a causal connection. *See Kipp v. Missouri Highway & Trans. Comm.*, 280 F.3d 893, 897 (8th Cir. 2002) (holding that an interval of two months between the protected activity and plaintiff's termination "so dilutes any inference of causation" that there is no causal connection); *Buettner v. Arch Coal Sales Co., Inc.*, 216 F.3d 707, 716 (8th Cir. 2000) ("Generally, . . . more than a temporal connection between protected activity and an adverse employment action is required to show a genuine factual issue on retaliation exists."). *See also Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (holding that temporal proximity alone may create a causal connection only where proximity is "very close," and approving of cases in which three and four month periods were held insufficient). Thus,

the four-month interval here, by itself, is insufficient to create a causal connection. Because Burns provides no other evidence of such a connection, he has not shown a prima facie case of retaliation.

Hy-Vee argues that even if Burns has made out a prima facie case, he cannot show that its reasons for firing him were pretext. Ray Stewart of Hy-Vee stated that Burns should not be allowed to service Hy-Vee stores because he may harbor bad feelings about the company and would therefore find it hard to work alongside his former colleagues. Stewart also testified that as a sales representative, Burns would have access to proprietary information, which he may be tempted to misuse. Burns claims that this explanation is pretext for two reasons. First, Burns simply contends that Stewart is wrong; Burns states that he would have no access to proprietary information, and that he would have no problems working in Hy-Vee stores. However, Burns offers no evidence to show that he is correct and Stewart is wrong. Therefore, in the absence of evidence that Hy-Vee's decision was intended to retaliate, the Court may not interfere with Hy-Vee's "wide latitude to make business decisions." *McLaughlin*, 50 F.3d at 511-12.

Second, Burns contends that Hy-Vee's statement about proprietary information was "a significant addition to its initial reasons," and therefore must be evaluated by a jury to determine whether it is pretext. *See Kobrin v. University of Minnesota*, 34 F.3d 698, 703 (8th Cir. 1994) ("Substantial changes over time in the employer's proffered reason for its employment decision support a finding of pretext."). Upon examining the record and Stewart's deposition testimony, it is apparent that Hy-Vee was simply uncomfortable having a fired (and therefore potentially disgruntled) former employee

working in its stores. Stewart's varied explanations of discomfort to employees or access to proprietary information are mere elaborations of this general reason.[7] *See Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 835 (8th Cir. 2002); *Lowery v. Hazelwood Sch. Dist.*, 244 F.3d 654, 658 (8th Cir. 2001) (holding that alleged inconsistencies in employer's reasons for termination were "actually only different ways of making the same point").

Thus, even if Burns had shown a prima facie case of discrimination, the Court finds that he has not shown that Hy-Vee's reasons for barring him from servicing its stores are pretext. Hy-Vee's motion for summary judgment on Count III, the retaliation claim, is therefore granted.

## IV. Tortious Interference with Contract

Count II of Burns's complaint alleges that Hy-Vee tortiously interfered with the employment contract between him and Nabisco. Hy-Vee contends no such contract existed, so it cannot be liable for tortious interference. To prove his claim of tortious interference under Minnesota law, Burns must establish all of the following elements: (1) the existence of a contract; (2) knowledge by Hy-Vee of the contract; (3) intentional procurement of the contract's breach; (4) without justification; and (5) damages. *Kallok*

---

[7] The Court finds that this business reason may be related to the particularities of the grocery business. Hy-Vee has stated that in the industry, sales representatives for food companies like Nabisco spend significant amounts of time in grocery stores like Hy-Vee, and are in many respects like co-workers with store employees.

*v. Medtronic, Inc.*, 573 N.W.2d 356, 362 (Minn. 1998); *Kjesbo v. Ricks*, 517 N.W.2d 585, 588 (Minn. 1994).

To support his claim, Burns cites only two Minnesota cases, *Swaney v. Crawley*, 191 N.W. 583 (Minn. 1923), and *Twitchell v. Nelson*, 155 N.W. 621 (Minn. 1915). Neither of these cases supports his claim. They stand for the proposition that a defendant in a tortious interference action need not have actual knowledge of a contract between the plaintiff and a third party, but merely knowledge of sufficient facts which, "if followed by reasonable inquiry, would have led to a complete disclosure of the contractual relations and the rights of the parties." *Swaney*, 191 N.W. at 584 (citing *Twitchell*). Burns apparently argues that because Hy-Vee knew of some potential relationship between him and Nabisco, it had a duty to inquire further about the nature of that relationship. This argument is beside the point, and the rule in *Swaney* is inapposite here. *Swaney* merely clarified the "knowledge" element of an action for tortious interference. *See id.* at 583-84. Its holding does not affect the independent element requiring existence of a contract. *See Kallok*, 573 N.W.2d at 362.

There was never an employment contract between Burns and Nabisco, just an offer. Moreover, Nabisco's offer was expressly contingent upon Burns's completion of a background check. As part of this check, Nabisco learned that Burns could not service Hy-Vee stores, and rescinded its offer. Thus, there was no contract to breach. *See CyberOptics Corp. v. Yamaha Motor Co., Ltd.*, Civ. No. 3-95-1174, 1996 WL 673161 at *19 (D. Minn. July 26, 1996) (holding that the "absence of an actual breach of a contract is fatal" to a tortious interference claim).

Even if a contract had been formed, and Burns provided evidence that Hy-Vee knew of the contract, Burns provides no evidence that Hy-Vee knew its actions would result in Nabisco rescinding its offer. Thus, Burns also cannot show intentional procurement of a breach. *See Howard Schultz & Assoc. Int'l, Inc. v. Evert Software, Inc.*, Civ. No. 01-547, 2001 WL 1618605 at * 5 (D. Minn. May 4, 2001) ("Absent a showing . . . that defendants have intentionally procured a breach of . . . contract[], plaintiff is unlikely to succeed on the merits of this claim.").

Finally, Burns also cannot show that Hy-Vee procured a contractual breach without justification. "There is no wrongful interference with a contract where one asserts 'in good faith a legally protected interest of his own . . . believ[ing] that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction.'" *Kjesbo*, 517 N.W.2d at 588 (quoting Restatement (2d) of Torts § 773 (1979)). As discussed above, the evidence shows that in excluding Burns, Hy-Vee exercised its business judgment in a manner in which it believed it was protecting its stores and employees. Burns has provided no evidence of any ill will or animus that may undermine this justification. Therefore, the Court concludes that even if Burns satisfied all the other elements of tortious interference with contract, he has not demonstrated that Hy-Vee's actions were without justification.

Because Burns cannot satisfy all the elements of a tortious interference with contract claim, the Court grants Hy-Vee's motion for summary judgment on Count II.

**ORDER**

Based on the foregoing, all the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that defendant's Motion for Summary Judgment [Docket No. 24] is **GRANTED** and plaintiff's complaint [Docket No. 1] is **DISMISSED with prejudice.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: May 23, 2003
at Minneapolis, Minnesota.

JOHN R. TUNHEIM
United States District Judge